NOT RECOMMENDED FOR FULL-TEXT PUBLICATION

File Name: 08a0160n.06

Filed: March 21, 2008

06-3322

# UNITED STATES COURT OF APPEALS
# FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF OHIO |
| | ) | |
| DAVID ANTHONY JOSEPH, | ) | |
| | ) | |
| Defendant-Appellant. | ) | |

Before: BATCHELDER and DAUGHTREY, Circuit Judges; ROSEN, District Judge.[*]

**PER CURIAM.** The defendant, David Anthony Joseph, was convicted by a jury of embezzling $219,980 from his employer, Metropolitan Bank and Trust, and was sentenced to 33 months' imprisonment, to be followed by four years of supervised release. At trial, the district court allowed testimony over the defendant's objection regarding three prior instances in which Joseph had embezzled or otherwise stolen from banks, holding that

---

[*]The Hon. Gerald E. Rosen, United States District Judge for the Eastern District of Michigan, sitting by designation.

these "other acts" were admissible under Federal Rule of Evidence 404(b). The defendant now appeals that evidentiary ruling, as well as two aspects of the determination of his guidelines sentencing range: the calculation of his criminal history score under U.S.S.G. § 4A1.2 and the application of a two-level enhancement to his offense level for abuse of a position of trust under U.S.S.G. § 3B1.3.

We conclude that the district court's misapplication of Rule 404(b) did not result in reversible error, nor do we find any error in the calculation of the defendant's criminal history score. However, our ruling in United States v. Humphrey, 279 F.3d 372 (6th Cir. 2002), requires a remand to the district court for re-sentencing without the application of an abuse-of-trust enhancement.

## FACTUAL AND PROCEDURAL BACKGROUND

The embezzlement charge in this case stemmed from the defendant's employment in Cleveland, Ohio, as head teller at Metropolitan Bank and Trust, later known as Sky Bank, from June 2000 through October 2000. On October 23, 2000, the bank's personnel office received a call from an official of a Columbus bank, National City Bank, informing them that Joseph was about to go to trial for theft and forgery charges relating to his fraudulent deposit of a $5,000 check into an account he had with National City Bank in December 1999. Soon thereafter, Metropolitan Bank suspended Joseph, audited the cash vaults over which he had had control and discovered that large amounts of cash were missing from these vaults. Metropolitan Bank subsequently terminated Joseph.

Joseph was charged in a single-count indictment with embezzling approximately $220,900 from Metropolitan Bank, in violation of 18 U.S.C. § 657. At trial, the government presented the testimony of several of the bank's employees indicating that Joseph accomplished the embezzlement by appearing to be a model employee, thereby gaining the trust of his immediate supervisors and then exploiting this trust in order to circumvent one of the security measures put into place by the bank, referred to as the "dual control" policy. Under that policy, two staff members were required to be present when money was counted so that no one person would have unfettered access to combinations and keys that accessed cash areas. The government's theory was that, by circumventing this security measure, Joseph was able to take cash from the main vault and an ATM vault without detection by another employee, who would otherwise have been present if the "dual control" system had been followed. Several of Joseph's co-workers testified that they saw Joseph dealing with the vault cash alone at various times and that Joseph had exclusive control over the vault areas during the time period immediately before his termination and the discovery of the missing cash. In fact, the bank personnel were initially unable to gain access to the vaults after Joseph was suspended because the ATM key and the combination were in Joseph's sole control and could not be located in his absence. A bank officer had to call Joseph in an effort to get the necessary information and eventually had to drill into one vault in order to perform the audit.

The government also presented the testimony of FBI Special Agent Smith, who investigated unusually high activity in Joseph's credit card account and several credit and

checking accounts held by members of his family during the period Joseph was employed by Metropolitan Bank. Smith found that $220,557.21 had been paid or deposited into these accounts during the relevant time period, an amount remarkably close to the $219,980 that was missing from Metropolitan Bank. Most of the deposits were made in large cash sums. Other payments were accomplished by Joseph's giving cash to his cousin and then asking his cousin to write a check in that amount.

Over Joseph's objection, the government also presented evidence concerning three prior acts, basing admissibility on Federal Rule of Evidence 404(b). Specifically, there was testimony about two instances in which Joseph had embezzled or otherwise stolen in relation to his employment with two financial institutions in Columbus, Star Bank and Chase Manhattan Mortgage Company, a subsidiary of Chase Manhattan Bank, as well as the instance outlined above, in which he had deposited a fraudulent check into his account at National City Bank.

From October 1998 through December 1998, Joseph was employed as head teller at Star Bank. Lori Elliott, the branch manager, and Sara Elswick, a teller, testified about Joseph's embezzlement from Star Bank. Elliott explained that although she was impressed by Joseph in his job interview, she quickly realized that he was not doing his job all that well. Both Elliott and Elswick described the circumstances surrounding Joseph's eventual termination for poor performance, explaining that when Joseph took a few days off of work for the first time in his tenure at Star Bank, he did not leave the combination to

the main cash vault behind for Elswick, who was filling in as head teller.  This violated bank procedure and ensured that the main cash vault could not be accessed in his absence. Elswick also noticed some paperwork out of order.  Elliott said that Joseph was terminated when he returned from vacation.   An audit performed shortly after his termination established that $99,391.28 in cash was missing from the vaults and other areas over which Joseph had had exclusive control.  Joseph was not prosecuted in connection with this bank loss.

From December 1999 through January 2000, Joseph was employed as an operations clerk at Chase Manhattan.  During that time, he stole four checks totaling $11,433.83 that were payable to bank customers and deposited them in his account and the account of a friend.  He pleaded guilty to this offense, and the plea was introduced into evidence at trial.

In December 1999 (while he was still employed at Chase Manhattan), Joseph deposited a fraudulent check in the amount of $5,000 drawn on a closed account into his National City Bank checking account.  The police detective who investigated this fraud testified at trial explaining that Joseph had eventually confessed, was indicted and the case proceeded to judgment.  It was this conduct that was reported to Metropolitan Bank and set into motion Metropolitan Bank's discovery of Joseph's embezzlement there.

Following the government's pre-trial disclosure of its intent to introduce proof of the defendant's prior offenses, Joseph made a motion *in limine* to exclude them.  At the

hearing on the motion, the district court held that the evidence was admissible and gave several justifications, including a ruling that the evidence showed knowledge, intent, *modus operandi*, and a continuing or common scheme or plan.  Discussing the continuing scheme or plan rationale, the court said, "I assume the Government is going to contend [that] Mr. Joseph repeatedly goes to work for banks, he learns the system, he works his way into the good grace of his employers, finds the soft spots, he takes money, and then he leaves before it's detected."  At the final pretrial conference, the district court modified its ruling, explaining that the jury would be instructed that the evidence was admissible to show a "continuing plan or common scheme to obtain money" only, and not on any other basis for admission.  The venire members were subjected to extensive voir dire on whether they would be able to consider evidence of prior bad acts only in so far as the evidence was a part of the defendant's common scheme or plan and not as proof of the defendant's propensity to engage in illegal behavior.  In addition, the judge gave limiting instructions to this effect both when the evidence was introduced at trial and in the final jury charge.

The jury found the defendant guilty of embezzlement.  At sentencing, the defendant objected to the inclusion of two previous convictions, secured in connection with the losses incurred by Chase Manhattan and National City Bank, in the calculation of his criminal history score.  He contended that because the district court had found that these offenses were part of a "common scheme or plan" that included the instant offense, the other convictions could not count as "prior sentences" under U.S.S.G. § 4A1.2 but, instead, were part of the "relevant conduct" of the instant offense.  The defendant also objected to a two-

level enhancement to his offense level pursuant to U.S.S.G. § 3B1.3 for abuse of a position of trust, arguing that his employment as head teller did not constitute a position of trust under relevant Sixth Circuit case law.  The district court overruled both objections, determined that Joseph had a criminal history category of III and an offense level of 18 (including the two-level enhancement), all of which produced a guideline range of 33-41 months imprisonment.  The district court imposed a sentence of 33 months.  Without the two-level enhancement, the applicable sentencing range would have been 27-33 months.

## DISCUSSION

### A.  404(b) Evidence of "Other Acts"

Joseph contends that the district court erred in denying his motion *in limine* and allowing testimony regarding his three prior offenses because "there was no evidence [that] the other acts derived from an agreement to commit a series of crimes, a plan, or a distinctive pattern" and, therefore, the evidence had no probative value other than that prohibited by Federal Rule of Evidence 404(b), *i.e.*, to invite the jury to infer that because he committed the prior acts, he was guilty of the charged offense.  He also contends that the error was not harmless given the scope of the 404(b) evidence introduced at trial, as well as the circumstantial nature of the other evidence presented against him.

Rule 404(b) provides in relevant part:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident . . . .

Fed. R. Evid. 404(b). The list of legitimate purposes is not exhaustive, and "[o]ne allowable purpose which traditionally has been stated as an exception to the 'other crimes' rule, but which was not included in the Rule 404(b) list of examples, is to show the existence of 'a common scheme or plan embracing the commission of two or more crimes so related to each other that proof of the one tends to establish the other.'" United States v. Burkley, 591 F.2d 903, 920 (D.C. Cir., 1978) (citation omitted); see also United States v. Blankenship, 775 F.2d 735, 739 (6th Cir. 1985) (citing Burkley with approval).

In reviewing a district court's evidentiary ruling pursuant to Rule 404(b), we follow a three-part inquiry that mirrors the district court's three-part analysis: "First, we review for clear error the district court's factual determination that sufficient evidence exists that the other acts occurred. Second, we review de novo whether the district court correctly determined that the evidence was admissible for a legitimate purpose. Third, we review for abuse of discretion the district court's determination that the 'other acts' evidence is more probative than prejudicial under Rule 403." United States v. Matthews, 440 F.3d 818, 828 (6th Cir.), cert. denied, 126 S.Ct. 2370 (2006).

In his brief, the defendant contests only the second step, arguing that the evidence was not properly admissible as showing a common scheme or plan. As he correctly points

out, we have previously explained that "[s]omething more than repeated performance of the same class of crimes is required in evidencing a 'design' or 'plan' which, if proved, may raise the inference that the accused was the perpetrator of the crime in question." United States v. Phillips, 599 F.2d 134, 136 (6th Cir. 1979). Rather, "there must either be an agreement to commit a series of crimes, [*i.e.,*] a 'plan,' or there must be a distinctive pattern [,*i.e.,*] '[t]he device used must be so unusual and distinctive as to be like a signature.'" Id. (citing McCormick, Evidence § 157 at 328 (1954)) (alteration in the original). As one treatise explains:

> What is crucial in this setting is that the other acts or crimes, considered in light of the circumstances, support an inference that the defendant or defendants formed a plan or scheme that contemplated commission of the charged crime. As one astute observer put it, "surrounding circumstances must support an inference that the crimes were related in the defendant's mind," and both the other acts and the charged crime "must be part of a common or continuing scheme." It is not enough that other crimes resemble the charged crime. If they are not sufficiently similar to the charged offense or not distinctive enough to be admitted to show *modus operandi* (hence identity), admitting other crimes to show plan or scheme merely because they bear some resemblance to the charged offense cannot be defended.

1 Christopher B. Mueller & Laird C. Kirkpatrick, Federal Evidence (3rd ed.) § 4:35 (citations omitted).

Although the government claims that all three prior bad acts are admissible because "the conduct of which [Joseph] was convicted was part of an ongoing scheme or plan, lasting over two years whereby Joseph obtained employment with banks or other financial institutions, used his banking knowledge and expertise, capitalized on any internal

shortcomings, and quickly defrauded the institutions of as much money as possible, before any loss was detected," there is very little evidence to support an inference that when Joseph committed the theft from Star Bank in 1998, he had hatched a plan or scheme to commit the later crimes, including the charged crime. The only two circumstances that arguably support this inference are the close similarity between the Star Bank theft and the Metropolitan Bank theft, as well as the relatively close timing of the crimes. See Mueller & Kirkpatrick, supra, § 4:36 (recognizing that "[c]ommitting strikingly similar deeds can tend to suggest on ongoing plan or scheme"). Tellingly, however, Joseph did not quit his employment at Star Bank and then move on directly to commit the similar offense at Metropolitan Bank; on the contrary, Joseph was fired for poor performance at Star Bank and then committed a markedly different offense – stealing checks payable to customers – at his next employment as an operations clerk at Chase Manhattan Mortgage Company, before becoming employed at Metropolitan Bank. Obviously, Joseph had a history of stealing from a series of employers through fraud and embezzlement, but this history does not support an inference that the series of crimes were "related in the defendant's mind," any more than it supports the inference that when his embezzlement at one job was stymied, Joseph simply tried again at his next job by whatever means was available to him at that time. In short, one must resort to speculation rather than legitimate inference to arrive at the conclusion that Joseph followed a pre-conceived plan to steal from several employers. It follows that the prior acts are not properly admissible on this ground.

Recognizing that the National City check fraud falls outside of the mold of Joseph's embezzlement from his bank-employers, the government offers another justification for this evidence, arguing that it is admissible as "res gestae" evidence, more properly referred to as background evidence. We have held that "those other acts that are inextricably intertwined with the charged offense or those acts, the telling of which is necessary to complete the story of the charged offense" constitute background evidence that falls outside the parameters of 404(b) and are admissible as long as there is an adequate "causal, temporal or spacial connection with the charged offense." United States v. Hardy, 228 F.3d 745, 748 (6th Cir. 2000). The government contends that because it was a call from a National City official that prompted Joseph's suspension and the investigation at Metropolitan Bank, the National City conviction "complete[s] the story of the charged [Metropolitan Bank] embezzlement" and therefore is admissible as background evidence. The call from National City, however, was tangential rather than integral to the story of the Metropolitan Bank embezzlement and was certainly not "necessary to complete the story of the charged offense."

More significantly, the government asserts that *modus operandi* also justifies the admission of the other acts evidence, although it has not offered us a particularly well-developed argument on this point in its brief. Nevertheless, we may affirm the district court on any ground supported by the record, see Clark v. Martinez, 295 F.3d 809, 814 n.7 (8th Cir. 2002), and we conclude that *modus operandi* provides a valid justification for admission of the Sky Bank embezzlement, if not the other two convictions.

*Modus operandi* provides a proper ground for admission when identity is at issue. See United States v. Perry, 438 F.3d 642, 648 (6th Cir.) ("[W]hen the issue is one related solely to identity, this Court has overwhelmingly approved the admission of 'other acts' evidence."), cert. denied, 126 S.Ct. 2045 (2006). Identity is clearly at issue in this case – Joseph's defense theory rests on the assertion that it was not he who took cash from the vaults.

To qualify as *modus operandi* evidence, the similarity between the prior crime and the charged offense must be striking, and the method must amount to a "signature." Id. However, "it is not necessary . . . that the crimes be identical in every detail." Id. (internal quotation, alteration, and citation omitted). Here, the similarity between the two crimes is striking: in a span of two years, Joseph twice obtained a position as head teller at a bank, made sure that he had exclusive access to the cash vaults by keeping the vault combinations to himself, in violation of bank procedures, and took large amounts of cash from those vaults. The defendant relies on a largely irrelevant distinction between the two offenses – that unlike Metropolitan Bank, Star Bank had no dual control procedures – in an attempt to defeat a *modus operandi* analysis, but this difference is not sufficiently probative to overcome the distinctive similarity between the two crimes. In addition, the difference is due to the lack of dual-control procedures at Star Bank rather than a meaningful change in Joseph's pattern of behavior. Cf. United States v. Mack, 258 F.3d 548, 554 (6th Cir. 2001) (dissimilarities that "represent a refinement of Defendant's technique" do not negate the inference of *modus operandi*).

Moreover, the shared characteristics of the two offenses are not necessarily typical of most embezzlement schemes, especially when considered in combination. See Id. ("standard conduct, although not particularly unusual by itself, may, in combination, present an unusual and distinctive pattern constituting a 'signature'"). In other words, Joseph could have embezzled funds from the two banks in a variety of ways – for instance by simply stealing checks, as he did at Chase Manhattan. Instead, he used virtually the identical process to accomplish both crimes, leading to a valid inference that it was the "method that the defendant tends to follow" and, in fact, did follow in the committing the instant offense. Mueller & Kirkpatrick, supra, § 4:36.

Determining that the evidence constitutes proof of *modus operandi* does not end our inquiry, however. We must also find that the district court did not abuse its discretion in concluding that the probative value of the evidence was not substantially outweighed by the danger of unfair prejudice pursuant to Federal Rule of Evidence 403. We generally look to four factors when making this determination: "(1) whether the other acts evidence is unduly prejudicial; (2) if other means of proof are available; (3) when the other acts occurred; and (4) whether the district court gave a limiting instruction." United States v. Stevens, 303 F.3d 711, 713 n.3 (6th Cir. 2002) (citing United States v. Brown, 147 F.3d 477 (6th Cir. 1998)). Here, because the jury received a "common scheme or plan" instruction only, no proper limiting instruction was given and, therefore, the last factor weighs in the defendant's favor. All other considerations, however, weigh in favor of admission: the evidence is highly probative of identity, it is not duplicative of other

evidence or readily amenable to other means of proof, and the two acts occurred within a two-year time frame. Hence, despite the district court's decision to admit the evidence on another basis, we conclude that there was no reversible error in permitting the jury to hear testimony concerning the Star Bank embezzlement.

With regard to the two prior offenses that did not qualify as admissible "other acts" under Rule 404(b), we conclude that any error that resulted from their introduction was, at best, harmless given the probative weight of the other evidence of guilt presented to the jury. That evidence, although largely circumstantial, can fairly be described as overwhelming. In this context, "[a]n error is harmless unless one can say, with fair assurance that the error materially affected the defendant's substantial rights – that the [jury] was substantially swayed by the error." Mack, 258 F.3d at 555 (internal quotation and citation omitted). The government presented testimony from several Metropolitan Bank employees that Joseph actively circumvented the bank's dual control policies. Crucially, there was also ample testimony that Joseph had exclusive access to the vaults immediately before the money was found missing. In fact, in order to access the vaults to conduct the audit in which the theft was uncovered, bank personnel had to call Joseph to get information and then had to drill open one vault. Finally, the expert testimony was extremely damning: the sum of unusually high payments and deposits made in Joseph's and his family members' accounts during the time period he worked at Metropolitan Bank match the sum of missing cash from the vaults almost exactly. Moreover, most of these payments were made in cash, or by asking his cousin to write a check in exchange for

cash.  The strength of this evidence, coupled with the district court's instruction to the jury not to take proof of the "other acts" as evidence of propensity, convinces us that reversal of the jury's verdict is not required in this case.

## B. The Guidelines Calculation: Criminal History

The defendant contends that his felony convictions for forgery and defrauding National City Bank and for theft of checks from Chase Manhattan should not have been included in the calculation of his criminal history score under U.S.S.G. § 4A1.1 because they were introduced into evidence under Rule 404(b) as part of a "common scheme or plan."  As a result, he reasons, they should instead have been considered "relevant conduct" under U.S.S.G. § 1B1.3(a)(2), which includes all "acts and omissions committed ... by the defendant" that "were part of the same course of conduct or common scheme or plan as the offense of conviction."

It is enough to point out at this juncture our determination that – for evidentiary purposes – the two prior offenses in question were not, in fact, part of the same scheme or plan or the product of the same *modus operandi*.  Given that ruling, and the fact that sentences for those convictions had already been imposed (and apparently served) at the time of the conviction in this case, there seems to be no reasonable basis for holding that they could nevertheless be considered anything other than "prior sentences" for purposes of determining Joseph's criminal history category.  Moreover, the defendant's effort to conflate Rule 404(b) and section 1B1.3(a)(2) is baseless.  Had Joseph been charged with

and convicted of multiple counts of embezzlement in this case, those convictions would be subject to grouping for purposes of calculating the guidelines range. See U.S.S.G. §§ 1B1.3(a)(2); 3D1.2(d). It does not follow, however, that the two prior unrelated convictions – one for theft of checks from a different employer and the other a theft and forgery charge – automatically fall within the ambit of "relevant conduct." Instead, those convictions qualify as "prior sentences" under section 4A1.2(a)(1), defined as "any sentence previously imposed upon an adjudication of guilt . . . for conduct not part of the instant offense."  It follows that the district court appropriately included the two "prior sentences" in the calculation of the defendant's criminal history score.

## C. The Guidelines Calculation: Abuse of Position of Trust

The district court was on less solid ground in rejecting the defendant's objection to the two-level enhancement to his offense level for abuse of a position of trust, which the district court applied pursuant to U.S.S.G. § 3B1.3. That guideline provides for such an enhancement "[i]f the defendant abused a position of public or private trust, or used a special skill, in a manner that significantly facilitated the commission or concealment of the offense."  The defendant contends that his job as head teller was not a position of trust under the Sixth Circuit's interpretation of section 3B1.3, pointing specifically to our opinion in United States v. Humphrey, 279 F.3d 372 (6th Cir. 2002).

In that case, the defendant was the head teller for ten branches of her employer-bank and her duties included supervising other tellers and counting the contents of the

bank's vault.  See id. at 374.  Although the bank had dual control policies that required another person to sign-off on Humphrey's vault tally, Humphrey was not closely supervised and therefore was able to circumvent the policies and gain unfettered access to the cash.  See id. at 375, 381.  She embezzled large amounts of cash from the vault and covered up the embezzlement for some time by submitting falsified paperwork.  See id.

The Humphrey court explained that the key inquiry for purposes of section 3B1.3 was not the level of supervision to which the defendant was subjected but, rather, "whether Humphrey's level of discretion was that of a fiduciary," distinguishing this circuit's approach from that of a number of other circuits that have emphasized the amount of supervision. See id. at 380-81 & n.5.  The court further explained that there is a distinction between employees who are authorized to *administer* another's property and those who are authorized only to *handle* it and are supervised to some degree when doing so, concluding that Humphrey "was not in a trust relationship with the Bank such that she could administer its property or otherwise act in its best interests."  See id. at 381 (citing United States v. Brogan, 238 F.3d 780, 784 (6th Cir. 2001)).  In other words, Humphrey "was not authorized to exercise substantial professional or managerial discretion in her position" and, therefore, although she clearly "abused her clerical position and the Bank's apparent trust in her[,] . . . she did not hold a position of trust."  Likewise, while Joseph's supervisors clearly trusted him to do his job with little or no supervision, they did not give him discretion with regard *how* he did his job.  Like Humphrey, he simply did not "exercise substantial professional

or managerial discretion" and, therefore, the Section 3B1.3 enhancement should not have been applied to his offense level.

The government attempts to distinguish <u>Humphrey</u> by focusing on a passage in which the <u>Humphrey</u> court observed that "[t]he very fact that the Bank uses a dual control policy, which requires at least two employees to verify counts, suggests that Humphrey was accorded limited discretion." <u>Id.</u> The government argues that unlike Humphrey, who ignored and circumvented the dual control policies unbeknownst to her supervisors, Joseph's supervisors trusted him to such a degree that they effectively acquiesced in his circumvention of the dual control policies and, therefore, that Joseph, unlike Humphrey, was given discretion sufficient to put him into a position of trust. The district court found this argument persuasive, but we do not.

Rather than focusing narrowly on <u>Humphrey</u>'s "dual control" language, we look to the dispositive question in that case: whether an employee's "level of discretion was that of a fiduciary" who "administered" rather than merely "handled" the bank's property. There is simply insufficient evidence in the record before us to establish that Joseph's position in the bank approached that level of discretion. Moreover, in Joseph's case, as in Humphrey's, the dual control restrictions under which he was supposed to operate clearly signal a position without a significant degree of trust. The fact that Joseph ignored those restrictions and engaged in unauthorized activity in order to steal from the entity that had put the restrictions in place cannot be said to have converted his position to one of trust.

- 18 -

We therefore conclude that the two-level enhancement under section 3B1.3 was inapplicable in this case.

## **CONCLUSION**

For the reasons set out above, we AFFIRM the defendant's conviction but VACATE the sentencing order and REMAND the case for re-sentencing.